**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *In re Application of* NORDEX ENERGY SE & CO. KG,<br><br>Movant. | Miscellaneous Action<br><br>No. 2:24-mc-00018-MSG |

**DECLARATION OF BENJAMIN RYHERD IN SUPPORT OF SKF USA INC.'S MOTION**
**TO VACATE THE MAY 31, 2024 ORDER GRANTING**
**NORDEX ENERGY SE & CO. KB'S 28 U.S.C. § 1782 *EX PARTE* APPLICATION**

I, Benjamin Ryherd, under penalty of perjury and pursuant to 28 U.S.C. §1746 and the laws of the United States of America, declare the following:

1. I am over the age of 18 and, except as otherwise noted, provide this Declaration based on my own personal knowledge and experience.

2. I am an Application Engineer Specialist, Renewable Energy.

3. I have reviewed the requests for production (the "Requests") contained in Nordex Energy SE & Co. KG's ("Nordex") Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action directed to SKF USA (the "Document Subpoena").

4. Each of the 11 Requests begins with "All Documents and Communications," followed by a broadly described topic.

5. The Requests are not directed to specific SKF USA business units and therefore would require SKF USA to search for responsive documents across its entire enterprise.

6. To produce documents responsive to the Requests, SKF USA would, at a minimum, be required to undertake the following:

a. Develop and agree upon search terms intended to identify potentially responsive documents;

b. Identify and agree upon custodial and non-custodial sources of information to which to apply the search terms;

c. Retain a vendor to provide support regarding document hosting and searching;

d. Apply search terms to custodial and non-custodial sources of information;

e. Human review of each document identified by search terms for responsiveness and any bases for withholding;

f. Create a log of withheld documents; and

g. Produce all responsive, non-withheld documents.

7. I am unable to provide an estimate of the cost and man-hours that would be required of SKF USA to respond to the Document Subpoena in the aforementioned manner, as these would be highly dependent upon the number and breadth of search terms as well as the number and size of custodial and non-custodial sources of information.

8. However, similar efforts undertaken by SKF USA in the past have cost several thousand dollars and required hundreds of man-hours from engineering resources that would be pulled from other committed projects.

9. If responding to Nordex's Document Subpoena proves comparable to these previous efforts, this would be a very significant burden on SKF USA's limited resources, especially considering that SKF USA is not party to underlying German proceeding nor has SKF USA manufactured the bearings involved in the dispute.

10. Moreover, SKF USA notes that these Requests in fact seem broader than any production SKF USA has been involved in the past.

11. For example, Request No. 5 seeks "All Documents and Communications" relating to "Insourcing Decision[s]" or "Manufacturing Change[s]" from 2018 onward. This would involve six (6) years of manufacturing information for SKF USA, which would potentially involve all of its data, which is equivalent to hundreds of thousands of documents.

12. Request No. 8 is even broader, seeking "All Documents and Communications" concerning the "Heat Treatment" process for the "Main Bearings" before or after any "Insourcing Decision and/or Manufacturing Change". This Request has no limit in time, which is important because all manufacturing of certain bearing components done by SKF USA involves some kind of heat treatment process. The breadth of this Request would encompass all documentation and communications relating to a major portion of SKF USA's business, which would cover hundreds of thousands of documents.

13. Request No. 1 is also unduly broad because it requests information about "Third Party Main Bearings". The subpoena defines "Third Party Main Bearings" as "bearings sourced by SKF to Third Party wind projects in the United States or elsewhere beginning in or around 2019...." These bearings are not at issue in the German litigation and SKF USA notes that the manufacturing for each of its clients is based on different contractual requirements and agreements which are confidential and proprietary for each of SKF USA's clients. Disclosure of this information to Nordex, a competitor of SKF USA's other clients, would present a competitive disadvantage for SKF USA's clients and would be a breach of SKF USA's contractual obligations to these clients.

14. I have further reviewed a translation of a German order from an evidentiary proceeding currently pending in Germany to evaluate whether SKF USA was involved with the manufacture of any of the products identified in that order. Specifically, that order references the

following serial numbers: SKF-0028R (WTG No. 86307), SKF-0034R (WTG NO. 85965), SKF-00107R (WTG NO. 86812), SKF-0070R (WTG NO. 86806), SKF-0015R (WTG NO. 86397), SKF-0010R (WTG NO. 86388), SKF-00116R (WTG NO. 86984), SKF-0068R (WTG NO. 86163), SKF-0076R (WTG NO. 86800), SKF-0060R (WTG NO. 86154), SKF-00198R (WTG No. 86968), SKF-0017S (WTG NO. 86972), SKF-0069S (WTG NO. 86868), SKF-00192R. (WTG No. 86650), SKF-00089S (WTG NO. 87349), SKF-0087S (WTG NO. 87347), SKF-00085S (WTG NO. 87346), SKF-0074S (WTG NO. 86862), SKF-00203R. (WTG No. 87011), SKF-005S (WTG No. 87007), SKF-00212S (WTG No. 87039), SKF-00192S (WTG NO. 87056), SKF-0080 (WTG No. 87324), SKF-00165S. (WTG No. 87220), SKF-00167S (WTG NO. 87217), SKF-00185S (WTG NO. 87052), SKF-00183S (WTG NO. 87227), SKF-00170S (WTG NO. 87221), SKF-00186S. (WTG No. 87043) and SKF-00181S (WTG No. 87103).[1]

15. I have reviewed SKF USA's files and can confirm that SKF USA did not manufacture any products with these serial numbers for Nordex.

16. However, to the extent a German judge determines that SKF USA documents or testimony are relevant to the contemplated proceeding to be brought by Nordex against SKF GmbH before German courts as asserted in the Section 1782 Application, SKF USA confirms that it will voluntarily produce any such documents or testimony which such German court deems relevant and admissible.

[1] Exhibit A, German Expert Evidentiary Proceeding Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Blue Bell, Pennsylvania, USA on August 8, 2024.

Benjamin Ryherd

# RYHERD DECLARATION
# EXHIBIT A

Beglaubigte Abschrift

**Landgericht Hamburg**
Az.: 329 OH 9/23

# Beweisbeschluss
# im selbständigen Beweisverfahren

In der Sache

**Nordex Energy SE & Co. KG**, vertreten durch die Nordex SE, diese vertreten durch ihren Vorstand mit den Vorstandsmigliedern José Luis Blanco Diéguez, Dr. Ilya Hartmann und Patxi Landa Esparza, Langenhorner Chaussee 600, 22419 Hamburg

**- Antragstellerin -**

Prozessbevollmächtigte:
Rechtsanwälte **Manner & Spangenberg Partnerschaft von Rechtsanwälten mbB**, An der Alster 64, 20099 Hamburg, Gz.: 10004-016 SCM/MCG

gegen

**SKF GmbH**, vertreten durch d. Geschäftsführer Thomas Burkhardt, Anna Krimmel und Jörg Wuttke, Gunnar-Wester-Straße 12, 97421 Schweinfurt

**- Antragsgegnerin -**

Prozessbevollmächtigte:
Rechtsanwälte **Gleiss Lutz**, Taunusanlage 11, 60329 Frankfurt, Gz.: 60573-23 SRu/oyka

beschließt das Landgericht Hamburg - Zivilkammer 29 - durch die Richterin am Landgericht Dr. Thaten, den Richter am Landgericht Dr. Gleim und die Richterin Kanzler am 02.05.2024:

I. Es ist ein schriftliches Sachverständigengutachten einzuholen zur Beantwortung folgender Fragen der Antragstellerin betreffend das Ausmaß, die Ursache und den Beseitigungsaufwand von Schadensbildern an Wälzkörpern in den von der Antragsgegnerin hergestellten und gelieferten 555 Hauptlagern vom Typ SKF 240/950 CA/CNLV026RE10, die in insgesamt 555 Windenergieanlagen des Typs Nordex Delta N 131 und Delta 4000 N 149 verbaut sind:

**A.**

In Bezug auf das **Ausmaß** der Schadensbilder an den Wälzkörpern der Hauptlager:

1) Welcher Art und welchen Umfangs sind die Schadensbilder an den Wälzkörpern der Hauptlager

(a) im Herstellungszeitraum vom 1. Mai bis 31. Oktober 2019 („Herstellungszeitraum 1“) mit folgenden Seriennummern: SKF-0028R (WEA-Nr. 86307), SKF-0034R (WEA-Nr. 85965), SKF-00107R (WEA-Nr. 86812), SKF-0070R (WEA-Nr. 86806), SKF-0015R (WEA-Nr. 86397), SKF-0010R (WEA-Nr. 86388), SKF-00116R (WEA-Nr. 86984), SKF-0068R (WEA-Nr. 86163), SKF-0076R (WEA-Nr. 86800) und SKF-0060R (WEA-Nr. 86154) (insgesamt zehn Hauptlager),

(b) im Herstellungszeitraum vom 15. November 2019 bis 15. April 2020 („Herstellungszeitraum 2“) mit folgenden Seriennummern: SKF-00198R (WEA-Nr. 86968), SKF-0017S (WEA-Nr. 86972), SKF-0069S (WEA-Nr. 86868), SKF-00192R (WEA-Nr. 86650), SKF-00089S (WEA-Nr. 87349), SKF-0087S (WEA-Nr. 87347), SKF-00085S (WEA-Nr. 87346), SKF-0074S (WEA-Nr. 86862), SKF-00203R (WEA-Nr. 87011) und SKF-005S (WEA-Nr. 87007) (insgesamt zehn Hauptlager),

(c) im Herstellungszeitraum vom 15. April bis 15. Oktober 2020 („Herstellungszeitraum 3“) mit folgenden Seriennummern: SKF-00212S (WEA-Nr. 87039), SKF-00192S (WEA-Nr. 87056), SKF-0080 (WEA-Nr. 87324), SKF-00165S (WEA-Nr. 87220), SKF-00167S (WEA-Nr. 87217), SKF-00185S (WEA-Nr. 87052), SKF-00183S (WEA-Nr. 87227), SKF-00170S (WEA-Nr. 87221), SKF-00186S (WEA-Nr. 87043) und SKF-00181S (WEA-Nr. 87103) (insgesamt zehn Hauptlager)?

Für die weiteren Einzelheiten betreffend die vorstehend benannten Hauptlager wird auf die **Anlage ASt 23** verwiesen (Serien-Nr, WEA-Nr, Standort, etc.). Drei der darin genannten Hauptlager, konkret die Nr. 11, 12 und 13 aus dem Herstellungszeitraum 2, sind bereits demontiert.

2) Sind die Schadensbilder an den in Ziff. I. A. 1) (a) bis (c) genannten Wälzkörpern der Hauptlager in den jeweiligen Herstellungszeiträumen gleichartig?

**B.**

In Bezug auf die **Ursache** der Schadensbilder an den Wälzkörpern der Hauptlager:

1) Worin liegt die Ursache für die Schadensbilder an den in Ziff. I. A. 1) (a) bis (c) genannten Wälzkörpern der Hauptlager? Hierbei sollen insbesondere auch folgende Fragen beantwortet werden:

(a) Sind die Schadensbilder auf einen fehlerhaft durchgeführten martensitischen Härteprozess im Rahmen der Wärmebehandlung des in den Wälzkörpern verwendeten Stahls zurückzuführen?

(b) Wären die Schadensbilder auch bei einem bainitischen Härteprozess im Rahmen der Wärmebehandlung des in den Wälzkörpern verwendeten Stahls aufgetreten?

(c) [*Ursprungsfrage entfällt, vgl. Anl. ASt 34, bzw. wird wie folgt konkretisiert:*]

(aa) Entsprechen die Wälzkörper, insbesondere das verwendete Material und der Materialzustand, im vorhandenen und/oder im gelieferten Zustand der Spezifikation EC03-Technical specification Rotorlager Triebstrang Delta 4000 (Anlage ASt 10, S. 13 - 33)?

(bb) Entsprechen die Wälzkörper, insbesondere das verwendete Material und der Materialzustand, im vorhandenen und/oder im gelieferten Zustand der Spezifikation K0806_057951_R02 (Anlage ASt 10, S. 1-12) gemäß Annex C Rahmenvertrag?

(cc) Entsprechen die Wälzkörper, insbesondere das verwendete Material und der Materialzustand, im vorhandenen und/oder im gelieferten Zustand den in Bezug auf die Mitgliedstaaten der EU, den USA und Südafrika anwendbaren nationalen und internationalen Gesetzen und Verordnungen sowie anwendbaren deutschen Qualitäts- und Sicherheitsstandards?

(dd) Entsprechen die Wälzkörper, insbesondere das verwendete Material und der Materialzustand, im vorhandenen und/oder im gelieferten Zustand den technischen Anforderungen des Quality Assurance Agreement (Anlage ASt 8) und insbesondere dem Stand der Technik („state of the art") gemäß Ziffer 4.2.1 Quality Assurance Agreement?

(ee) Weisen die Wälzkörper, insbesondere das verwendete Material und der Materialzustand, im vorhandenen und/oder im gelieferten Zustand die Qualität auf, die von vergleichbaren Produkten üblicherweise erwartet wird?

(d) Wurden die Sollwerte der Reinheitsgrade gemäß DIN EN ISO 683-17:2015 Tabelle A.1 in höchstbelasteten Bereichen der Wälzkörper (maximale Hertzsche Pressung) bei dem für die Fertigung der Wälzkörper verwendeten Stahl eingehalten?

(e) Sind die Wälzkörper, insbesondere das verwendete Material im vorhandenen und/oder im gelieferten Zustand für die Verwendung in Hauptlagern für Windenergieanlagen geeignet?

sowie betreffend die Ursache die folgenden **Ergänzungsfragen der Antragsgegnerin**:

(f) Wurden die Wälzlager fachgerecht transportiert, montiert und in Betrieb genommen? Können die Schadensbilder aus nicht fachgerechtem Transport, Montage oder Inbetriebnahme herrühren?

(g) Können die Schadensbilder Folge des Designs der Windenergieanlagen sein?

(h) Wurden die Wälzlager entsprechend der Vorgaben der Antragsgegnerin gewartet? Können die Schadensbilder die Folge unzureichender Wartung sein?

(i) Entsprachen die tatsächlichen Betriebsbedingungen der Wälzlager am Einsatzort durchgehend denen, für die die Wälzlager spezifiziert sind?

(j) Gab es Betriebsbedingungen oder Betriebsmodi der Windenergieanlagen, die zu den Schadensbildern der Wälzlager geführt haben können?

(k) Wie sind die unterschiedlichen Ausfallraten der Wälzlager in bestimmten Regionen bzw. Windparks zu erklären? Gibt es spezifische Betriebsbedingungen oder äußere Einflüsse, die diese Verteilung erklären?

2) Ist aufgrund der unter Ziff. I. B. 1) a) - e) festgestellten Ursachen aus technischer Sicht davon auszugehen, dass die dort festgestellten Schadensbilder auch bei Wälzkörpern der in den übrigen 525 eingesetzten Hauptlagern auftreten werden und, wenn ja, aufgrund welcher konkreter Anhaltspunkte?

C.

In Bezug auf den **Aufwand** zur Beseitigung der Schadensbilder an den Wälzkörpern der Hauptlager:

1) Welche Maßnahmen sind notwendig, um die unter Ziff. I. A. festgestellten Schadensbilder und die unter Ziff. I. B. festgestellten Ursachen vollständig zu beseitigen? Kommen neben dem vollständigen Austausch der Hauptlager andere Maßnahmen zur vollständigen Beseitigung der Schadensbilder und Schadensursachen in Betracht und, wenn ja, welche?

2) Welche Kosten werden für die unter Ziff. I. C. 1. festgestellten Maßnahmen pro Hauptlager schätzungsweise anfallen?

3) Welche Kosten werden für die unter Ziff. I. C. 1 festgestellten Maßnahmen schätzungsweise anfallen, wenn diese an sämtlichen 555 Hauptlagern ergriffen werden müssen?

II. Das Gericht wird die Akte im nächsten Schritt – wie von den Parteien gewünscht – der **DNV SE,** Brooktorkai 18, 20457 Hamburg, übersenden, mit der Bitte einen geeigneten Sachverständigen vorzuschlagen, der über Kenntnisse und Erfahrungen im Bereich des Fachgebiets Windenergieanlagen sowie der metallischen Werkstoffkunde verfügt.

Die DNV SE soll im Rahmen ihrer Stellungnahme auch offenlegen, ob sie vergangene oder laufende Geschäftsbeziehungen zu einer der Parteien unterhält. Sobald der Vorschlag der DNV SE für einen oder mehrere Gutachter vorliegt, wird dieser den Parteien zur Stellungnahme übersandt werden.

III. Die Antragstellerin hat einen Auslagenvorschuss von **25.000,00 €** einzuzahlen die Antragsgegnerin einen Vorschuss in Höhe von **5.000,00 €**. Die Versendung der Akten zur DNV SE wird davon abhängig gemacht, dass bis spätestens **14.06.2024** die Einzahlung des Auslagenvorschusses dem Gericht nachgewiesen wird. Die Nachforderung weiterer Vorschüsse bleibt ausdrücklich vorbehalten.

## Gründe:

Der Beweisbeschluss entspricht inhaltlich den Vorgaben der Antragstellerseite, die als „Herrin des Verfahrens" dessen Inhalt und Reichweite grundsätzlich bestimmen kann. Lediglich die Nummerierung wurde - der Übersichtlichkeit halber - angepasst. Die zuletzt mit Schriftsatz der Antragsgegnerin vom 10.04.2024 angebrachten Anregungen sind dagegen nicht übernommen worden. Ein hinreichendes Interesse der Antragstellerin an der Beantwortung „ihrer Fragen" im Sinne des § 485 Abs. 2 Nr. 1 - 3 ZPO, dessen Voraussetzungen von der Rechtsprechung sehr weit gefasst werden, liegt vor. Eine weitergehende rechtliche Prüfung wird vom Gericht nicht vorgenommen, insbesondere bleibt die Klärung der von den Parteien aufgeworfenen rechtlichen Fragen dem Hauptsacheprozess vorbehalten.

Gleichermaßen hat aber auch die Antragstellerseite ein hinreichendes Interesse, ihre unter Ziff. I. B. Nr. 1 f) - k) niedergelegten Fragen im Hinblick auf mögliche Alternativursachen aufgeklärt zu sehen. Lediglich die Frage „Weisen von der Antragstellerin eingesetzte Wälzlager anderer Hersteller ähnliche Schadensbilder auf?" (SchrS AGV v. 26.01.2024, dort S. 2, 10 f.) erachtet die Kammer als unzulässig, da sie über den hiesigen Gegenstand hinausgeht, nämlich die Begutachtung des Zustands und etwaiger Schadensursachen der 555 von der Antragsgegnerin gelieferten Hauptlager vom Typ SKF 240/950 CA/CNLV026RE10. Die im Übrigen gestellten Fragen sind dagegen zulässig, ggf. notwendig werdende Konkretisierungen werden im Laufe des Verfahrens durch den Sachverständigen veranlasst werden. Die Kosten für die Beantwortung der von ihr aufgeworfenen Fragen hat die Antragsgegnerin zu tragen.

Prozessleitend weist die Kammer ergänzend darauf hin, dass für die Durchführung der Beweisaufnahme im europäischen und nichteuropäischen Ausland umstritten ist, inwieweit vorab jeweils die Zustimmung des betroffenen Landes im Wege der internationalen Rechtshilfe einzuholen ist, § 363 ZPO. Dies hängt u.a. davon ab, ob die Tätigkeit des Sachverständigen als hoheitliche Tätigkeit einzuordnen ist (vgl. Zöller, ZPO, 35. Aufl. 2024, § 363 Rn. 16, 63), z.B. wenn dort Ortstermine durchgeführt werden. Sofern es erforderlich werden sollte, derartige Zustimmungen vorab einzuholen, droht dies - angesichts der Vielzahl der hier betroffenen Länder, z.B. Türkei, Argentinien, Vereinigte Staaten, usw (vgl. Anl. ASt 23), das Verfahren erheblich in die Länge zu ziehen. Da zum derzeitigen Zeitpunkt noch nicht feststeht, wer als Sachverständiger benannt wird und welchen Prozess der Erkenntnisgewinnung dieser vorschlagen wird, ist indes beim derzeitigen Stand (noch) nichts zu veranlassen. Das Gericht erteilt den obigen Hinweis nur vorab, damit die Parteien dies in ihre Überlegungen zum weiteren Vorgehen, bestmöglich unter Einbeziehung des noch zu bestellenden Sachverständigen, mit einbeziehen können.

| | | |
|---|---|---|
| Dr. Thaten | Dr. Gleim | Kanzler |
| Richterin am Landgericht | Richter am Landgericht | Richterin |

Für die Richtigkeit der Abschrift
Hamburg, 02.05.2024

Göhner, JFAng
Urkundsbeamter der Geschäftsstelle

Dokument unterschrieben
von: Göhner, Justiz der Freien und
Hansestadt Hamburg
am: 02.05.2024 15:26

**Landgericht Hamburg**
**Zivilkammer 29**

**Sievekingplatz 1**
**20355 Hamburg**

| | |
|---|---|
| Telefon (Durchwahl): | (040) 4 28 43 - 4669 |
| Telefon (Zentrale): | (040) 4 28 28 - 0 |
| Telefax (Geschäftsstelle): | (040) 4279-85259 |
| Telefax: | (040) 4 27 98 – 3162 / 3163 |

SAFE-ID: safe-sp1-1425982792549-015792812

Zimmer: A 257

Landgericht Hamburg, 329 OH 9/23
Postfach 300121, 20348 Hamburg

Rechtsanwälte
Gleiss Lutz
Taunusanlage 11
60329 Frankfurt

Bitte bei Antwort angeben:
Geschäftsnummer:
**329 OH 9/23**

Hamburg, den 02.05.2024

In Sachen
Nordex Energy SE & Co. KG ./. SKF GmbH

**Ihr Zeichen:** 60573-23 SRu/oyka

Sehr geehrte Damen und Herren Rechtsanwälte,

anbei erhalten Sie eine beglaubigte Abschrift des Beschlusses vom 02.05.2024.

Mit freundlichen Grüßen

Göhner, JFAng
Urkundsbeamter der Geschäftsstelle
Dieses Schreiben wurde elektronisch erstellt und ist ohne Unterschrift gültig.
Den barrierefreien Zugang zum Gebäude erfragen Sie bitte vorab telefonisch.

**Datenschutzhinweise:**
Informationen zum Schutz personenbezogener Daten bei deren Verarbeitung durch die Justiz nach Artikel 13 und Artikel 14 der Europäischen Datenschutz-Grundverordnung finden sich auf der Internetseite des Hanseatischen Oberlandesgerichts unter https://www.justiz.hamburg.de/rechtsprechung-senate/datenschutzhinweise
Auf Wunsch übersenden wir diese Informationen auch an Verfahrensbeteiligte in Papierform.

Certified copy

**Hamburg Regional Court**
Ref.: 329 OH 9/23

# Evidence order
# In independent proceedings of evidence

On the matter

Nordex Energy SE & Co. KG, represented by Nordex SE, represented by its Executive Board with Executive Board members José Luis Blanco Diéguez, Dr. Ilya Hartmann and Patxi Landa Esparza, Langenhorner Chaussee 600, 22419 Hamburg

- **Applicant** -

Prozessbevollmächtigte:
Lawyers Manner & Spangenberg Partnership of Lawyers mbB,
At the Alster 64, 20099 Hamburg, GZ.: 10004-016 SCM/MCG

against

SKF GmbH, represented by the Managing Director Thomas Burkhardt, Anna Krimmel and Jörg Wuttke, Gunnar-Wester-Straße 12, 97421 Schweinfurt

- **Respondent** -

Process representatives
Attorneys Gleiss Lutz, Taunusanlage 11, 60329 Frankfurt, GZ.: 60573-23 SRU/oyka

The District Court Hamburg - Civil Chamber 29 - decides by the judge at the District Court Dr. Thaten, the judge at the District Court Dr. Gleim and the judge Chancellor on 02.05.2024:

I. A written expert opinion must be obtained to answer the following questions from the applicant concerning the extent, cause and effort involved in the elimination of damage patterns on rolling elements in the 555 main bearings of type SKF 240/950 CA/CNLV026RE10 manufactured and delivered by the defendant, installed in a total of 555 Nordex Delta N 131 and Delta 4000 N 149 turbines:

A..

With regard to the **extent of** damage patterns at the rolling elements of the main bearings:

1) What kind and extent are the damage patterns on the rolling elements of the main bearings

(a) During the manufacturing period from 1 May to 31 October 2019 ("Production period 1") with the following serial numbers: SKF-0028R (WTG No. 86307), SKF-0034R (WTG NO. 85965), SKF-00107R (WTG NO. 86812), SKF-0070R (WTG NO. 86806), SKF-0015R (WTG NO. 86397), SKF-0010R (WTG NO. 86388), SKF-00116R (WTG NO. 86984), SKF-0068R (WTG NO. 86163), SKF-0076R (WTG NO. 86800) and
SKF-0060R (WTG NO. 86154) (ten main warehouses in total),

(b) During the manufacturing period from 15 November 2019 to 15 April 2020 ("Production period 2") with the following serial numbers: SKF-00198R (WTG No. 86968), SKF-0017S (WTG NO. 86972), SKF-0069S (WTG NO. 86868), SKF-00192R.
(WTG No. 86650), SKF-00089S (WTG NO. 87349), SKF-0087S (WTG NO. 87347), SKF-00085S (WTG NO. 87346), SKF-0074S (WTG NO. 86862), SKF-00203R.
(WTG No. 87011) and SKF-005S (WTG No. 87007) (ten main warehouses in total),

(c) During the manufacturing period from 15 April to 15 October 2020 ("Production period 3") with the following serial numbers: SKF-00212S (WTG No. 87039), SKF-00192S (WTG NO. 87056), SKF-0080 (WTG No. 87324), SKF-00165S.
(WTG No. 87220), SKF-00167S (WTG NO. 87217), SKF-00185S (WTG NO. 87052), SKF-00183S (WTG NO. 87227), SKF-00170S (WTG NO. 87221), SKF-00186S.
(WTG No. 87043) and SKF-00181S (WTG No. 87103) (ten main warehouses in total)?

For further details regarding the main warehouses mentioned above, please refer to Appendix Ast 23 (serial number, turbine number, location, etc.). Three of the main bearings mentioned in it, specifically Nos. 11, 12 and 13 from the production period 2, have already been dismantled.

2) Are the patterns of damage to the rolling elements of the main bearings mentioned in point I. A. 1 (a) to (c) similar in the respective production periods?

B.

With regard to the cause of damage to the rolling elements of the main bearings:

1) What is the cause of the damage patterns on the rolling elements of the main bearings mentioned in section I. A. 1) (a) to (c)? In particular, the following questions will be answered:

(a) Are the damage patterns due to an incorrectly carried out martensitic hardening process in the context of heat treatment of the steel used in the rolling elements?

(b) Would the damage patterns also have occurred during a bainitic hardening process as part of the heat treatment of the steel used in the rolling elements?

(c) *[The question of origin does not apply, cf. Branch 34, or will be concretized as follows.'*

(AA) Do the rolling elements, in particular the material used and the condition of the material, in the present and/or delivered condition correspond to the specification ECO3-Technical Specification Rotor Bearing Drive Train Delta 4000 (Appendix Ast 10, pp. 13 - 33)?

(Bb) Do the rolling elements, in particular the material used and the material condition, in the present and/or delivered condition, comply with specification K0806_057951_R02 (Appendix Ast 10, pp. 1-12) in accordance with Annex C framework agreement?

(Cc) Do the rolling elements, in particular the material used and the condition of the material, in the present and/or delivered condition, comply with the national and international laws and regulations applicable in relation to the Member States of the EU, the USA and South Africa, as well as German quality and safety standards applicable?

(DD) Do the rolling elements, in particular the material used and the material condition, comply with the technical requirements of the Quality Assurance Agreement (Appendix Ast 8) and in particular with the state of the art in accordance with Section 4.2.1 Quality Assurance Agreement in the existing and/or delivered condition?

(EE) Do the rolling elements, in particular the material used and the condition of the material, in the present and/or delivered condition, have the quality normally expected of comparable products?

(d) Were the target values of the purity levels in accordance with DIN EN ISO 683-17:2015 Table A.1 observed in the most heavily loaded areas of the rolling elements (maximum Hertzian pressure) for the steel used for the production of the rolling elements?

(e) Are the rolling elements, in particular the material used in the present and/or delivered condition, suitable for use in main bearings for wind turbines?

as well concerning that Cause that the following
**Supplementary questions** **The respondent:**

(f) Were the roller bearings properly transported, assembled and put into operation? Can the damage patterns result from improper transport, assembly or commissioning?

(g) Can the damage patterns be the result of the design of the turbines?

(h) Were the rolling bearings maintained in accordance with the requirements of the respondent? Can damage patterns be the result of insufficient maintenance?

(i) Did the actual operating conditions of the rolling bearings at the place of use consistently correspond to those for which the rolling bearings are specified?

G) Are there operating conditions or operating modes of the turbines that could have caused the damage patterns of the rolling bearings?

(K) How can the different failure rates of the rolling bearings in certain regions or wind farms be explained? Are there specific operating conditions or external influences that explain this distribution?

2) Given the causes identified under point I. B. 1) a) - e), can it be assumed from a technical point of view that the damage patterns identified there will also occur in rolling elements of the main bearings used in the other 525 and, if so, on the basis of what specific indications?

C.

With regard to the **effort** to eliminate the damage patterns on the rolling elements of the main bearings:

1) What measures are necessary in order to completely eliminate the damage patterns identified under point I. A. and the causes identified under point I. B.? In addition to the complete replacement of the main warehouses, are other measures considered for the complete elimination of damage patterns and causes of damage and, if so, which ones?

2) What is the estimated cost per main warehouse for the measures identified under point I. C. 1?

3) What is the estimated cost of the measures identified under point I.C. 1, if they have to be taken at all 555 main warehouses?

In the next step, the court will send the file to DNV SE, Brooktorkai 18, 20457 Hamburg, as requested by the parties, with the request of a suitable expert with knowledge and experience in the field of wind turbines and metallic materials science.

DNV SE shall also disclose in the context of its comments whether it maintains past or ongoing business relations with one of the parties. As soon as DNV SE's proposal for one or more assessors is available, it will be sent to the parties for comments.

III. The claimant must pay an advance of 25,000.00 G; the claimant must pay an advance of 5,000.00 €. The dispatch of the files to DNV SE is subject to the fact that the payment of the advance of expenses is proven to the court by **14.06.2024** at the latest. The Nale demand for further advances remains expressly reserved.

Indr

## Reasons:

The decision of proof corresponds in content to the requirements of the applicant side, which, as the "owner of the proceedings", can in principle determine its content and scope. Only the numbering has been adapted for the sake of clarity. However, the suggestions made last in the respondent's submission of 10.04.2024 have not been accepted. The applicant has a sufficient interest in answering "her questions" within the meaning of § 485 (2) No. 1 - 3 ZPO, the requirements of which are very broadly defined by the case law. The court does not carry out any further legal examination, in particular the clarification of the legal questions raised by the parties remains reserved for the main proceedings.

Likewise, the applicant side has a sufficient interest in reducing its
B. No. 1 g - k), with regard to possible alternative causes. Only the question "Do anti-friction bearings from other manufacturers used by the applicant show similar damage patterns?" (SchRS AGV v. 26.01.2024, p. 2, 10 f.), the board considers it inadmissible, since it goes beyond the subject-matter of the present case, namely the assessment of the condition and possible causes of damage of the SKF 240/950 CA/CNLV026RE10 main bearings supplied by the respondent in 555. The questions asked by the other parties are, however, admissible; any necessary clarifications will be initiated by the expert in the course of the procedure. The costs of answering the questions raised by the respondent shall be borne by the respondent.

In the lead of the proceedings, the board also points out that, in order to carry out the taking of evidence in European and non-European countries, it is disputed to what extent the consent of the country concerned must be obtained in advance by means of international legal assistance, § 363 ZPO. This depends, among other things, on whether the activity of the expert is to be classified as a public service activity (cf. Zöller, ZPO, 35th edition 2024, § 363 marg. 16, 63), e.g. if local appointments are carried out there. If it becomes necessary to obtain such approvals in advance, this threatens - in view of the large number of countries concerned,
For example, Turkey, Argentina, United States, etc. (cf. Branch 23), the process is considerably lengthened. However, since it is not yet clear who will be appointed as an expert and which process of gaining knowledge will be proposed by the latter, nothing can be done (yet) at this stage. The Court of First Instance shall give the above notice only in advance so that the parties may include this in their considerations on the further course of action, in the best possible way with the involvement of the expert still to be established.

| Dr. Thaten | Dr. Gleim | Chancellor |
|---|---|---|
| Judge<br>At the District Court | Judges<br>At the District Court | Judge |

For the accuracy of the transcript Hamburg, 02.05.2024

Göhner, JFAng
Registrar of records of the office

Document signed
From: Göhner, Justice of the Free
and Hanseatic City of Hamburg
on: 02.05.2024 15:26

**Hamburg Regional Court**
Civil Chamber 29

**Sievekingplatz 1**
20355 Hamburg
Telephone (extension): (040) 4 28 43 - 4669
Telephone (control panel): (040) 4 28 28 - 0
Fax (office): (040) *4279-85259*
Fax: (040) 4 27 98 - 3162 / 3163
SAFE ID: safe-sp1-1425982792549-015792812

Rooms: A 257

District Court Hamburg, 329 OH 9/23 P.O. Box 300121 , 20348 Hamburg

Please indicate in reply: Business number:
329 OH 9/23

Lawyers Gleiss
Lutz Taunusanlage
11
60329 Frankfurt

"

Hamburg, 02.05.2024

In things
Nordex Energy SE & Co. KG ./. SKF GmbH

Your sign: 60573-23 SRU/oyka

Dear Lawyers,

Please find enclosed a certified copy of the decision dated 02.05.2024.

Best regards, Göhner,

JFAng
Registrar of records of the office
This letter was created electronically and is valid without a signature.
For barrier -free access to the building, please call us in advance.

**Privacy Notice:**
Information on the protection of personal data during their processing by the judiciary pursuant to Article 13 and Article 14 of the European General Data Protection Regulation can be found on the website of the Hanseatic Higher Regional Court at

On request, we will also send this information to parties to the proceedings in paper form.